## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| ROBERT VIDAL and HOLGER OCANA,<br><br>    Plaintiffs,<br><br>  v.<br><br>METRO-NORTH COMMUTER RAILROAD<br>COMPANY,<br><br>    Defendant. | No. 3:12-cv-00248 (MPS) |

### MEMORANDUM OF DECISION

On February 17, 2012, Plaintiffs Holger Ocana and Robert Vidal ("Plaintiffs") filed a complaint against Defendant Metro-North Commuter Railroad Co. ("Defendant") for violation of Title VII of the Civil Rights Act of 1964, alleging disparate impact and disparate treatment on the basis of color, ethnicity, and/or national origin. Defendant has moved for summary judgment. Because I find that Plaintiffs have abandoned their disparate impact claim, and have failed to establish pretext in support of their disparate treatment claim, I GRANT Defendant's Motion for Summary Judgment and do not consider Defendant's alternative argument for summary judgment based on the doctrine of laches.

### BACKGROUND

Plaintiff Ocana began working for Defendant in February 2001 as an electrician in the Maintenance of Equipment Department. His national origin is Ecuadorian and his ethnicity is Hispanic or Latin American. (Compl., ¶ 4.) Plaintiff Vidal began working for Defendant in August 1999, also as an electrician in the Maintenance of Equipment Department. His national origin is Dominican and he is black of color. (*Id.*, ¶ 5.)

Defendant offers a Foreman-in-Training ("FIT") program to employees who are interested in being promoted to the position of foreman. (L.R. 56(a)1, ¶ 11; L.R. 56(a)2, ¶ 11.) Plaintiffs' Title VII claims focus on the selection process for the FIT program in 2006. To be eligible for promotion to the FIT program, applicants were required to have a certain amount of specific work experience. (*Id.*) Additional selection criteria included a review of past job experience, attendance records, disciplinary history, and safety history, a written test to evaluate basic knowledge, a structured panel interview, and performance appraisals from two types of supervisors. (L.R. 56(a)1, ¶ 12; L.R. 56(a)2, ¶ 12; Promotion to Foreman Flyer (Def. Ex. 5).) There is no cap on the number of applicants who can be admitted to the FIT program during any given selection cycle. (L.R. 56(a)1, ¶ 19; L.R. 56(a)2, ¶ 19.)

Plaintiff Ocana had previously applied and been denied acceptance into the FIT program in 2003, 2004, and both sessions that took place in 2005. (Pls. Opp. Mem. at 6.) Plaintiff Vidal had previously applied and been denied acceptance into the FIT program in 2003, and one session that took place in 2005.[1] (*Id.* at 7.) In 2006, Plaintiffs each applied to the program and, after passing the preliminary requirements, were allowed to proceed to the interview stage of the process. (*See* L.R. 56(a)1, ¶¶ 14, 30, 45; L.R. 56(a)2, ¶¶ 14, 30, 45.) After Plaintiffs were interviewed, and after the interviewers met together as a "consensus committee," both Plaintiffs were denied acceptance into the FIT program. (*See* L.R. 56(a)1, ¶¶ 80, 86; L.R. 56(a)2, ¶¶ 80, 86.) On June 22, 2006, Plaintiffs dual filed charges of discrimination against Defendant with the Connecticut Commission on Human Rights and Opportunities ("CHRO") and the Equal Employment Opportunity Commission ("EEOC"). (*See* Pls. Ex. 39 at 2; Compl., ¶ 8.) Additional facts are set forth below in the Discussion section.

---

[1] Plaintiff Vidal withdrew his February 2005 application before the interview stage. (Pls. Opp. Mem. at 7.)

## STANDARD

Under Fed. R. Civ. P. 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "While the court must view the inferences to be drawn from the facts in the light most favorable to the party opposing the motion, a party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Lipton v. Nature Co.*, 71 F.3d 464, 469 (2d Cir. 1995) (internal quotation marks and citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## DISCUSSION

In their complaint, Plaintiffs allege two different theories of employment discrimination under Title VII of the Civil Rights Act – disparate impact and disparate treatment. (Compl., Count One at ¶ 26, Count Two at ¶ 27; Pls. Opp. Mem. at 2.) A "disparate impact" theory of discrimination is separate from a "disparate treatment" theory of discrimination:

> Th[e] [Supreme] Court has consistently recognized a distinction between claims of discrimination based on disparate treatment and claims of discrimination based on disparate impact. . . . [D]isparate treatment is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex, or other protected characteristic. Liability in a disparate-treatment case depends on whether the protected trait actually motivated the employer's decision. By contrast, disparate-impact claims involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity. Under a disparate-impact theory of discrimination, a facially neutral employment practice may be deemed illegally discriminatory without evidence of the employer's subjective intent to discriminate that is required in a disparate-treatment case.

*Raytheon Co. v. Hernandez*, 540 U.S. 44, 52 (2003) (internal quotation marks and citations omitted).

Plaintiffs have waived their disparate impact claim.  In their brief in response to the motion for summary judgment, they included no analysis of disparate impact as a distinct claim, treating the statistical data evidence they marshalled instead as part of their disparate treatment claim.[2]  (Pls. Opp. Mem. at 25-26.)  At the July 24, 2014 oral argument, Plaintiffs' counsel confirmed that he was asking the Court to consider Plaintiffs' statistical evidence only in the context of Plaintiffs' disparate treatment claim.[3]  I therefore turn to consideration of Plaintiffs' claim for disparate treatment, and will consider the statistical evidence in that context in Section

---

[2] A disparate impact claim follows an analytical framework distinct from a disparate treatment claim.  *Compare Robinson v. Metro-N. Commuter R.R. Co.*, 267 F.3d 147, 160 (2d Cir. 2001), *abrogated on other grounds by Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541 (2011) (disparate impact claims subject to burden-shifting analysis requiring plaintiff to establish a *prima facie* case, which often requires statistical proof that an identified practice or policy has resulted in a disparity, and then requiring defendant to rebut plaintiff's statistical proof or demonstrate that the challenged practice or policy is consistent with business necessity; if defendant opts for the latter option, then the burden shifts back to plaintiff to show the existence of an alternative that would achieve the same business objective without a disparate impact), *with McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) (disparate treatment claims subject to three-step burden-shifting analysis requiring plaintiff to establish *prima facie* case, then requiring defendant to put forth legitimate, non-discriminatory reason, then requiring plaintiff to show pretext).

[3] "THE COURT: Let's move on to another issue.  Are you making a disparate impact claim in this case?  ATTORNEY: Yes, your Honor.  THE COURT: You didn't brief it from what I could see.  You talked about the issue of statistics only in the context of trying to show pretext, right?  ATTORNEY: Yes, your Honor.  I think the idea was to tie that into the disparate impact allegation of the complaint.  THE COURT:  Well, but disparate impact and disparate treatment are two separate theories, as I'm sure you know.  And you analyzed the statistics in connection with the pretext argument which is part of a disparate treatment analysis, right?  ATTORNEY: Yes.  THE COURT: I didn't see anything in your brief analyzing a distinct disparate impact claim.  ATTORNEY: I'm not going to disagree with you on that, your Honor. . . . THE COURT: I think you're correct if what you're saying is, look, you can consider statistics in the treatment part.  I think that's right.  Is that what you're asking me to do?  ATTORNEY:  Yes, your Honor.  THE COURT:  You're not asking me to do a separate disparate impact analysis?  ATTORNEY: No."

4

III.C. below.  *See Vuona v. Merrill Lynch & Co., Inc.*, 919 F. Supp. 2d 359, 374 (S.D.N.Y. 2013) (in certain circumstances, statistics may be used to support a claim for disparate treatment).

A disparate treatment claim alleging a discriminatory failure to promote under Title VII is analyzed using the *McDonnell Douglas* burden shifting framework, which first requires that Plaintiffs establish a *prima facie* case.  *Aulicino v. New York City Dep't of Homeless Servs.*, 580 F.3d 73, 80 (2d Cir. 2009).  In the event that Plaintiffs meet that burden, the burden shifts to Defendant to offer a legitimate, non-discriminatory reason for its actions.  *Id.*  If Defendant meets that burden, Plaintiffs must "show circumstances that would permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination."  *Id.*  "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

## I.    *Prima Facie* **Case**

"A plaintiff asserting a Title VII discrimination claim based on a failure to promote establishes a *prima facie* case by showing that at the relevant time: (i) the plaintiff was a member of a protected class; (ii) the plaintiff applied for and was qualified for the job; (iii) the plaintiff was rejected for the position; and (iv) the rejection of the plaintiff's application occurred under circumstances giving rise to an inference of discrimination."  *Lomotey v. Connecticut-Dep't of Transp.*, 355 F. App'x 478, 480 (2d Cir. 2009).  Defendant does not dispute that Plaintiffs have each satisfied the first and third prongs necessary to establish a *prima facie* case.  (Def. Summ. J. Mem. at 8.)

With respect to the second prong, "*McDonnell Douglas* requires only a minimal showing of qualification to establish a *prima facie* claim" and a plaintiff "only needs to demonstrate that

[]he possesses the basic skills necessary for performance of the job." *Owens v. New York City Hous. Auth.*, 934 F.2d 405, 409 (2d Cir. 1991) (internal quotations marks and citations omitted). The Second Circuit has underscored the minimal nature of this showing:

> [W]e have long emphasized that the qualification prong must not be interpreted in such a way as to shift into the plaintiff's *prima facie* case an obligation to anticipate and disprove the employer's proffer of a legitimate, non-discriminatory basis for its decision. To show qualification sufficiently to shift the burden of providing some explanation for discharge to the employer, the plaintiff need not show perfect performance or even average performance. . . . The role of the qualification prong is simple to help eliminate the most common nondiscriminatory reasons for the plaintiff's rejection.

*Gregory v. Daly*, 243 F.3d 687, 696 (2d Cir. 2001) (internal quotations marks and citations omitted); *see also Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 92 (2d Cir. 2001) ("[A]ll that is required is that the plaintiff establish basic eligibility for the position at issue, and not the greater showing that he satisfies the employer. The qualification prong must not . . . be interpreted in such a way as to shift onto the plaintiff an obligation to anticipate and disprove, in his *prima facie* case, the employer's proffer of a legitimate, non-discriminatory basis for its decision.")

There is no dispute that both Plaintiffs met the preliminary requirements for selection to interview for the FIT program. (Def. Summ. J. Mem. at 8.) These preliminary requirements included a review of Plaintiffs' respective attendance records, disciplinary history, and safety history, satisfactory completion of a written test, submission of an acceptable writing sample, and completion of a personality test. (Promotion to Foreman Flyer (Def. Ex. 5); Kenwood Dep. (Def. Ex 6) at 17-19.) Defendant argues that both Plaintiffs failed the interview portion of the selection process, and were therefore unqualified for promotion to the FIT program. (Def. Summ. J. Mem. at 9-13.) In doing so, Defendant attempts impermissibly to require Plaintiffs to disprove Defendant's proffered legitimate, non-discriminatory reasons as part of Plaintiffs'

*prima facie* case.  Because Plaintiffs' disparate treatment claim focuses on discrimination that allegedly took place during the interview process, Defendant cannot use Plaintiffs' poor performance in that same interview process as the basis for disputing that Plaintiffs have established a *prima facie* case.  That Plaintiffs met the preliminary requirements for the FIT interview demonstrates, almost in and of itself, that Plaintiffs had the basic skills necessary to perform the job.  A review of the record, including Plaintiffs' statements during the interviews, does not reveal anything that would disqualify Plaintiffs for the position.  *Compare Marlow v. Office of Court Admin. of State of N.Y.*, 820 F. Supp. 753, 755 (S.D.N.Y. 1993) (plaintiff failed to meet the qualification prong of a *prima facie* case due to "hostile and belligerent demeanor during the interviews, his inappropriate dress of dirty, casual clothes, and comments which his interviewers interpreted as racist").  Plaintiffs therefore satisfy the second prong of a *prima facie* case.

As with the second prong, Plaintiffs need only make a minimal showing to establish the fourth prong of a *prima facie* case:

> Plaintiff's burden in showing an inference of discrimination is *de minimis*.  A rational trier of fact need only to be able to infer that the decision was based *in part* on discrimination. . . . Therefore, the admissible evidence need only be sufficient enough to permit a jury to infer a discriminatory motive.  This includes circumstantial evidence.  Evidence that a person outside of Plaintiff's protected class was offered the desired position is sufficient for a jury to infer a discriminatory motive.

*Johnson v. Connecticut*, 798 F. Supp. 2d 379, 386-87 (D. Conn. 2011) (internal quotation marks and citations omitted) (emphasis in original); *see also Ellis v. Century 21 Dep't Stores*, 975 F. Supp. 2d 244, 271 (E.D.N.Y. 2013) (fourth prong satisfied where female plaintiff provided evidence that the promotion was offered to a man, an individual outside of her protected class).  Because all four of the individuals who were accepted to the FIT program in 2006 were

Caucasian and thus not part of Plaintiffs' protected classes, Plaintiffs have satisfied the fourth and final prong of their *prima facie* case.  (*See* M of E Promotion to Foreman Program Data (Pls. Ex. 36).)

## II.     Legitimate, Non-discriminatory Reasons

Because Plaintiffs have each established a *prima facie* case, Defendant must offer a legitimate, non-discriminatory reason for its decision not to promote Plaintiffs to the FIT program.  "The employer need not persuade the court that it was motivated by the reason it provides; rather, it must simply articulate an explanation that, if true, would connote lawful behavior." *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 52 (2d Cir. 1998).  Defendant proffers that it did not recommend either Plaintiff to the FIT program due to poor interview performance and average performance evaluations.  (*See* Def. Summ. J. Mem. at 18-19.) Plaintiffs concede that Defendant has set forth legitimate, non-discriminatory reasons for its decision that are sufficient to shift the burden back to Plaintiffs to show pretext.  (Pls. Opp. Mem. at 24 ("In the instant case, the Defendant alleges that the Plaintiffs' rejections resulted from their interview performance, and to a lesser extent, the performance valuation scores they received from superiors.  Thus, the burden now falls to the Plaintiffs to demonstrate that this proffered reason is merely pretext for illegal discrimination.")

## III.    Pretext

### A.  Relevant Legal Principles

In order to survive summary judgment, Plaintiffs must present some evidence that, when viewed in the light most favorable to Plaintiffs, suggests that the stated non-discriminatory reasons for Defendant's decision not to accept Plaintiffs into the FIT program were "pretext" for acting in a discriminatory manner; mere speculation or disagreement with those reasons is

insufficient.  *See Crawford-Mulley v. Corning Inc.*, 194 F.Supp.2d 212, 220 (W.D.N.Y. 2002).

More specifically, the Second Circuit has described the "pretext" showing as follows:

> The plaintiff must produce not simply some evidence, but sufficient evidence to
> support a rational finding that the legitimate, non-discriminatory reasons proffered
> by the defendant were false, and that more likely than not discrimination was the
> real reason for the employment action.  In short, the question becomes whether
> the evidence, taken as a whole, supports a sufficient rational inference of
> discrimination.  To get to the jury, "[i]t is not enough . . . to disbelieve the
> employer; the factfinder must [also] believe the plaintiff's explanation of
> intentional discrimination."

*Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) (*quoting St. Mary's Honor Ctr. v.*

*Hicks*, 509 U.S. 502, 519 (1993)); *see also Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 156-57

(2d Cir. 2010) ("In proving a case under Title VII, following the defendant's proffer of a

justification, a plaintiff need only show that the defendant was in fact motivated at least in part

by the prohibited discriminatory animus. . . . [The] reference to the falsity of the employer's

asserted justification [in Supreme Court opinions does not mean] intent to deceive, but

inaccuracy or incompleteness resulting from the failure to include the fact of the discriminatory

motivation.").

It is undisputed in this case that, once an applicant reached the interview stage, as both

Plaintiffs did, advancement to the FIT program was based on subjective qualifications, namely

performance during a panel interview and the consensus committee's review of performance

evaluations.  (See L.R. 56(a)1, ¶¶ 63, 64, 76.)  It is also undisputed that both Plaintiffs received

lower ratings through this process than the successful Caucasian candidates.  (*See* Stagnaro Aff.

(Def. Ex. 7) at ¶ 28.)  Thus, whether Plaintiffs can raise a genuine issue of material fact regarding

pretext turns on whether a reasonable juror could find that the ratings given to each applicant

through the Defendant's interview and subsequent "consensus committee" process were not

credible, such that they masked other, discriminatory reasons for Defendant's failure to accept

Plaintiffs into the FIT program.  To demonstrate pretext, Plaintiffs must point to evidence that their ratings were not credible or did not accurately reflect their performance.

To evaluate credibility, it is necessary to review carefully the evidence supporting the reasons for the ratings given by the interviewers and consensus committee:

> Courts have recognized that an employer's disregard or misjudgment of a plaintiff's job qualifications may undermine the credibility of an employer's stated justification for an employment decision.  *See Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C.Cir.1996) ("Evidence indicating that an employer misjudged an employee's performance or qualifications is, of course, relevant to the question whether its stated reason is a pretext masking prohibited discrimination."); *Tyler v. Re/Max Mountain States, Inc.*, 232 F.3d 808, 814 (10th Cir.2000) (quoting *Fischbach*); *Alexander v. Fulton County, Ga.*, 207 F.3d 1303, 1340 (11th Cir.) (noting that "evidence showing an employer hired a less qualified applicant over the plaintiff may be probative of whether the employer's proffered reason for not promoting plaintiff was pretextual"), *reh'g and reh'g in banc denied*, 218 F.3d 749 (11th Cir. 2000).

*Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 103 (2d Cir. 2001).  The focus of this scrutiny is credibility, not the substance of the criteria employed or the wisdom of the employer's decisions:

> At the same time, "the court must respect the employer's unfettered discretion to choose among qualified candidates." *Fischbach*, 86 F.3d at 1183; *see also Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1330 (10th Cir.) ("Our role is to prevent unlawful hiring practices, not to act as a 'super personnel department' that second guesses employers' business judgments.") (citations omitted), *cert. denied*, 528 U.S. 815, 120 S.Ct. 53, 145 L.Ed.2d 46 (1999).

*Id*.  And where a discrepancy in qualifications is the sole evidence the plaintiff offers at the pretext stage, that discrepancy must be dramatic:

> When a plaintiff seeks to prevent summary judgment on the strength of a discrepancy in qualifications ignored by an employer, that discrepancy must bear the entire burden of allowing a reasonable trier of fact to not only conclude the employer's explanation was pretextual, but that the pretext served to mask unlawful discrimination.  In effect, the plaintiff's credentials would have to be so superior to the credentials of the person selected for the job that no reasonable

person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question.

*Id*.

It is also important to keep in mind that Title VII does not prohibit employers from using subjective criteria for hiring or promotion, as long as the process is transparent and the explanations for the employer's decisions specific and clear:

> There is nothing unlawful about an employer's basing its hiring decision on subjective criteria, such as the impression an individual makes during an interview. . . . [A]n employer's explanation of its reasons must be clear and specific in order to afford the employee a full and fair opportunity to demonstrate pretext. Where an employer's explanation, offered in clear and specific terms, is reasonably attributable to an honest even though partially subjective evaluation of qualifications, no inference of discrimination can be drawn.

*Id*. at 104-05 (internal quotation marks and citations omitted); *see also Rouse v. City of New York*, No. 08-cv-7419, 2009 WL 1532054, at *8 n.9 (S.D.N.Y. June 2, 2009) (when relying on subjective criteria, "an employer's explanation must be clear, specific and honest"). Relying heavily on subjective criteria is permissible where, as here, an employee is being considered for a supervisory position. *Robertson v. Sikorsky Aircraft Corp.*, No. 397-cv-1216, 2000 WL 33381019, at *3 (D. Conn. July 5, 2001) ("Subjective criteria necessarily and legitimately enter into personnel decisions involving supervisory positions." (citation omitted)); *Allen v. City of Yonkers*, 803 F. Supp. 679, 704 (S.D.N.Y. 1992) ("Where an employee is in a supervisory position, however, the employer may rely on subjective criteria to a greater extent."). This Court has adopted the Eleventh Circuit's observation that:

> [S]ubjective evaluations of a job candidate are often critical to the decision[-]making process, and if anything, are becoming more so in our increasingly service-oriented economy. Personal qualities factor heavily into employment decisions concerning supervisory or professional positions. Traits such as common sense, good judgment, originality, ambition, loyalty, and tact often must be assessed primarily in a subjective fashion, yet they are essential to an individual's success in a supervisory or professional position. It is inconceivable

11

that Congress intended anti-discrimination statutes to deprive an employer of the ability to rely on important criteria in its employment decisions merely because those criteria are only capable of subjective evaluation.

*Robertson*, 2000 WL 33381019, at *3-4 (*quoting Denney v. City of Albany*, 247 F.3d 1172, 1185-86 (11th Cir.2001)).

### B.  Interview Process

Defendant employed a "structured interview" process to evaluate candidates for the FIT program.  Applicants knew in advance that they would be questioned by a panel.  (Promotion to Foreman Flyer (Def. Ex. 5).)  Each applicant was interviewed by a three-person panel made up of representatives from Human Resources, the Maintenance of Equipment Department, and Training Department, and all applicants were asked the same set of sixteen questions.  (L.R. 56(a)1, ¶ 15; L.R. 56(a)2, ¶ 15.)  The last three questions were situation-based "supervisory questions."  (*See* Ocana and Vidal Interview Sheets (Pls. Exs. 15, 19).)  At the bottom of the page for each supervisory question, the interviewer was instructed to "look for a 'take charge' attitude," and given sample content of what should be included in the answer.  (*See id.*)

Each member of the interview panel took notes of the applicant's answers and evaluated the applicant by assigning one of three ratings – "do not consider further," "some reservations about considering further," or "recommend applicant for promotion to foreman" – based on the interviewer's overall impression of the applicant's performance during the interview.  (L.R. 56(a)1, ¶ 16; L.R. 56(a)2, ¶ 16; *see also* Interview Sheets (Ex. A. of Def. Ex. 7).)  Each interviewer was instructed to rate the applicants independently: "Make independent judgment; do not discuss interview until after you make your decision.  ***Include clear comments below such as answer to specific questions, to justify your recommendation.  Do not use vague statements.***"  (Interview Sheets (Ex. A. of Def. Ex. 7) (emphasis in original).)  After the

interview, the consensus committee would assign a numerical rating of 0 through 2 to correspond with the recommendation of each interviewer.  A rating of "do not consider further" was assigned a 0; "some reservations about considering further" was assigned a 1; "recommend applicant for promotion to foreman" was assigned a 2.  (Stagnaro Aff. (Def. Ex. 7) at ¶ 27.)

After their interviews, Plaintiffs Ocana and Vidal had a numerical rating of "000" and "110," respectively.  Because four Caucasian applicants were interviewed in 2006, all of whom were accepted into the FIT program, there are four possible comparators: John Murman, with an interview numerical rating of "222;" Edward Bownas, with an interview numerical rating of "222;" David Garnot, with an interview numerical rating of "211;" and Robert Grehl, with an interview numerical rating of "111."  (*Id* at ¶ 28.)  Plaintiffs and Messrs. Grehl and Murman were interviewed by Dan Miller, John Stagnaro, and Linda Kenwood, while Messrs. Bownas and Garnot were interviewed by a different panel.  (*See* Local Rule 56(a)(2), ¶¶ 37, 52.)  Given the significantly better interview ratings of Messrs. Murman, Bownas, and Garnot, and the different interview panel for Messrs. Bownas and Garnot, Mr. Grehl is the closest comparator to Plaintiffs.

Because each Plaintiff's performance in the interview process was distinct, I will analyze the evidence concerning that performance separately for each Plaintiff.

### 1.  Plaintiff Ocana

In his 2006 interview, Plaintiff Ocana received the least successful rating of "do not consider further" from all three interviewers.  (Pls. Ex. 15.)  Interviewer Miller provided the following comments in support of his "do not consider further" rating of Plaintiff Ocana: "Does not take charge. Looking for boss to handle out of the ordinary situations. Reluctant to make decisions. Obvious actions were not suggested in situational questions."  (*Id.*)  In support of his "do not consider further" rating of Plaintiff Ocana, Interviewer Stagnaro reported: "Poor answers

13

to situation questions. *no decision making ability – 'push upward.'  Lack of understanding of supervisor responsibilities and safety concepts."  (*Id.*)  Interviewer Kenwood, who also gave Plaintiff Ocana a "do not consider further" rating, explained: "language barrier – had difficulty understanding. Not strong answers on situational questions.  Weak answers to 1 and 2.  Doesn't want to take resp[onsibility] for employees – wants upper [management] to handle.  Not sure of safety audit/brief – should have better knowledge."  (*Id.*)

These comments by the interviewers are "clear and specific," satisfying the requirement of transparency imposed in *Byrnie* for subjective hiring and promotion processes and undercutting Plaintiffs' vague claim that the subjectivity of the interview process was itself evidence of discriminatory intent.  Further, none of the comments or ratings themselves betrayed discriminatory intent – including the comment made by a single reviewer about Plaintiff Ocana's "language barrier," which is addressed below.  All of the comments also reflected a noted absence of the "'take charge' attitude" each interviewer was specifically instructed to "look for" – an instruction that does not appear to be out of place for those evaluating possible foreman candidates.  And the fact that all three interviewers independently gave Plaintiff Ocana a low rating further undermines Plaintiffs' effort to show pretext.  (*See* Ocana Interview Sheets (Pls. Ex. 15).)  As for the credibility of the comments, I find that they are supported by Plaintiff Ocana's responses, as documented by the interviewers.

For example, the interviewers' comments that Plaintiff Ocana performed poorly on the situational questions because he would not "take charge" and would instead turn to upper management for direction are consistent with the notes of his responses to these questions.  (Pls. Ex. 15 (Miller reported that in response to question 14, Ocana said "call [s]omebody higher than me . . . . I would report them to my supervisors."  For question 14, Stagnaro wrote that Ocana

had provided "no real answer – would ask <u>boss</u>.  I [Ocana] never had that [situation] happen – all my life.  Report to supervisors."  For question 16, if an electrician was not doing assigned work, Kenwood recorded Ocana's response as "can't force him to work; let him move to another job.").)   Similarly, the comments about Plaintiff Ocana's uncertainty regarding safety are consistent with the interviewers' notes of Plaintiff Ocana's answers and other evidence in the record.  (*Compare id.* (Plaintiff Ocana was reported by all interviewers as saying that a safety audit is "observing how employees work" and should be done "every week by management"), *with* Stagnaro Aff. (Def. Ex. 7) at ¶ 20 ("[Ocana's] response demonstrated to me that he did not seem to understand the foreman's role in the safety audit.  In a safety audit, the foreman (line supervision) must walk around the shop, observe and evaluate the work performed by employees, note violations if necessary, and complete forms for compliance.  The foreman position is supervision, not management."), *and* Pls. Ex. 8 (interviewee John Murman, who, according to Interviewer Miller, "nailed safety," responded that a safety audit is "walking around shop noting unsafe conditions and behaviors" and should be done "any time.").)

Plaintiff Ocana compares his responses to Interview Questions 1, 13, 14, and 16 to those given by non-minority applicants in an attempt to demonstrate that he should have received a rating at least equal to the non-minority applicants.  (*See* Local Rule 56(a)(2), ¶¶ 32, 34-36.)  For example, he asserts that the interviewers were "subjective and arbitrary in their assessment of [his] perceived weakness such as . . . 'take charge' qualities" (L.R. 56(a)2, Sec. 2, ¶ 6; Pls. Opp. Mem. at 7), and provides a chart showing his responses and those of two Caucasian applicants, Mr. Bownas and Mr. Garnot.  When asked: "Tell us what you know about a Foreman's responsibilities and what skills and abilities are necessary to be a good foreman," Plaintiff Ocana reportedly stated "receive orders or direction from management" along with some comments

15

about communication skills, computer skills, and the ability to assess the skills of his workforce. (L.R. 56(a)2, ¶ 32.)  Plaintiff Ocana then points out that Mr. Bownas also said "take and give orders" and, similarly, Mr. Garnot said something akin to "work with superiors and convey problems." (*Id.*)

Plaintiff Ocana neglects to mention, however, that the Caucasian applicants made additional comments in response to the question that were distinct from his and that, in the interviewer's estimation, might reasonably have warranted a higher rating.  (*See id*. (Mr. Bownas: "Timekeeping – complete timely.  Mediator – assign workers to best of abilities" and "Does work in a timely fashion, know your men."  Mr. Garnot: "Understand work and tasks involved" and "In the end the job must get done.")  Ultimately, the comparison chart fails to show or even raise a reasonable inference that ratings were not credible or that discrimination was the real reason behind them.

I draw the same conclusion when considering the comparison charts provided for Plaintiff Ocana's responses to Questions 13, 14, and 16.  In addition, the comparison charts do not mention Plaintiff Ocana's answers to other questions, which the interviewers likely considered in rating Plaintiff Ocana lower than the Caucasian applicants.  For example, Interviewer Kenwood wrote that Plaintiff Ocana had "weak answers to 1 **and 2**," but a comparison chart of question 2 was not provided by Plaintiff Ocana.  (*See* L.R. 56(a)2, ¶ 27 (emphasis added).)  In question 2, interviewees were asked "[i]f you are accepted, what do you expect to get out of this training program?"  (*See* Ocana Interview Sheets (Pls. Ex. 15).)  Plaintiff Ocana responded that he wanted to broaden his knowledge of engines and learn more about other work locations, such as Harlem and Hudson.  (*See id*.)  Compare Plaintiff Ocana with Mr. Bownas, who said that he sought to familiarize himself with "points" (e.g., shop, yard), learn

about newer equipment, and gain supervisory skills (Pls. Ex. 7) and Mr. Garnot, who said that he wanted to acquire leadership skills and learn more about railroad regulations (Pls. Ex. 5).  Both of these men explicitly stated that they hoped to gain skills related to managing subordinates, which is at least related to the "'take charge' attitude" that Defendant sought in applicants to the FIT program.

With respect to Question 10, Plaintiff Ocana reported less supervisory experience than well-performing interviewees; not including any volunteer activities, Plaintiff Ocana had spent two years as a foreman for a plastics company and fifteen months for another company as a senior mechanic with supervisory responsibilities (Pls. Ex. 15), while Mr. Garnot had spent seven years as a lead maintenance technician for IBM (Pls. Ex. 5) and Mr. Murman had spent nine years as a lead ramp serviceman for Eastern Airlines (Pls. Ex. 8).  Question 12 asked interviewees about their computer skills.  Plaintiff Ocana explained that he had limited skills and used computers primarily for online use.  (Pls. Ex. 15.)  In comparison, Messrs. Bownas, Garnot, and Grehl all reported at least some use of Microsoft applications, such as Microsoft Word, Access, Excel, and/or PowerPoint.  (Pls. Ex. 5-7.)  When viewing the documentation of the interviews holistically, I find that no reasonable inference of discriminatory animus may be drawn from the fact that the Caucasian interviewees were given higher interview ratings than Plaintiff Ocana.

Plaintiffs make much of the reference to a "language barrier" in Interviewer Kenwood's statement in Plaintiff Ocana's Recommendation: "Language barrier – had difficulty understanding."  (L.R. 56(a)2, ¶ 37.)  Standing alone, however, an employer's reference to a job candidate's language deficiencies or accent is not evidence of discriminatory animus.  "An adverse employment decision may be predicated upon an individual's accent when – but only

when – it interferes materially with job performance.   There is nothing improper about an employer making an *honest* assessment of the oral communications skills of a candidate for a job when such skills are reasonably related to job performance." *Fragante v. City & Cnty. of Honolulu*, 888 F.2d 591, 596-97 (9th Cir. 1989) (citing EEOC Compliance Manual (CCH) ¶ 4035 at 3877–78 (1986)); *see also Mejia v. New York Sheraton Hotel*, 459 F. Supp. 375, 376 (S.D.N.Y. 1978) (chambermaid properly denied promotion to front desk where English proficiency was significantly related to successful job performance); *Ang v. Procter & Gamble Co.*, 932 F.2d 540, 549 (6th Cir. 1991) ("Unlawful discrimination does not occur . . . when a plaintiff's accent affects his ability to perform the job effectively."); *Martin v. Olathe Health Sys., Inc.*, No. 11-cv-2179, 2012 WL 2874062, at *6 (D. Kan. July 13, 2012) (same).

    Because Plaintiff Ocana was being considered for a program designed to train individuals to occupy a foreman position with supervisory responsibilities, his communication skills were reasonably related to job performance.   Had he been accepted into the FIT program, he would have needed to be able to communicate clearly and effectively with his subordinates. In addition, there is no indication that Ms. Kenwood based her low rating of Plaintiff Ocana solely or even primarily on his accent.   She offered additional reasons for his poor rating: "Not strong answers on situational questions.   Weak answers to 1 & 2.   Doesn't want to take resp[onsibility] for employees – wants upper [management] to handle.   Not sure of safety audit/brief – should have better knowledge."   (L.R. 56(a)2, ¶ 37.)   These comments are also reflected in the other interviewers' recommendation notes.   (*See id*.)   Finally, the evidence in the record does not support an inference that Ms. Kenwood's assessment of Plaintiff Ocana's communication skills betrayed discriminatory animus.   There is no indication that the observation was made in derogatory fashion or reflected anything other than her factual observation that she had difficulty

understanding him.  *See Martin*, 2012 WL 2874062, at *6 ("[B]ecause there is no evidence that anyone mocked plaintiff because of her accent or otherwise made statements about her accent in a derogatory fashion, defendant's reliance on plaintiff's accent for the termination decision is not actionable under Title VII.").

These facts distinguish this case from *Hasham v. California State Bd. of Equalization*, 200 F.3d 1035, 1042, 1044 (7th Cir. 2000) – on which Plaintiffs rely – where (1) the final decision maker who denied the promotion to the foreign-born plaintiff had made contradictory comments about the plaintiff's language skills and accent and admitted that the plaintiff's performance in the job interview was excellent, (2) the plaintiff was clearly better qualified than the individual selected for the promotion in terms of education, certification as a CPA, and exam performance, and (3) the company had deviated from previous practice when making the promotion.

Although Plaintiffs make no reference in their brief about this point, their Local Rule statement cites a finding made by the CHRO that "[t]he interview process may have been biased against foreign born candidates with thick accents:"

> In 2006 respondent interviewed nine candidates.  Five were minority group members . . . . three of these five candidates were rejected in part by at least one panelist who perceived a language barrier.  One panelist commented about the complainant, "language barrier-had difficulty understanding."  In the case of the two other candidates, both had high performance evaluation ratings, Abdus Salam (Asian) and Sena Amevor (African), at least one panel member commented about "language," "communication obstacle."

(L.R. 56(a)2, Sec. 2, ¶ 8; Ocana Aff. Ex. H (Pls. Ex. 14) at 6.)  While a CHRO finding may be considered at the summary judgment stage if such a finding has been assessed by the Court as being trustworthy, *see Barlow v. Connecticut*, 319 F. Supp. 2d 250, 258 (D. Conn. 2004), I decline to do so in this case because the evidence supporting the CHRO's finding has not been

presented to the Court.  *See Johnson*, 972 F. Supp. 2d at 223 ("The findings of the CHRO on the ultimate issue in dispute is of dubious reliability as Plaintiff has not filed the underlying evidence substantiating the finding in opposition to the motion for summary judgment, nor have the Defendants.  Because no evidence in the record supports any of the foregoing arguments or factual assertions, the Court disregards them in its analysis."  (citations omitted)).  Plaintiffs failed to include the individual performance evaluations or interview sheets for Abdus Salam or Sena Amevor.  As a result, there is no context provided to determine whether the "communication obstacle" statement was made with discriminatory animus.  Further, it is unknown which interviewer made the "communication obstacle" comment or which interviewee it referred to.  As the panel that interviewed Plaintiff Ocana did not interview Abdus Salam (*see* Stagnaro Aff. (Def. Ex. 7) at ¶ 22), the "communication obstacle" comment may have been made by an interviewer on a different interview panel and, in that case, would have little bearing on Plaintiff Ocana's disparate treatment claim.  In addition, there is some evidence in the record before the Court that is inconsistent with the CHRO's finding.  For instance, the CHRO's statement that Abdus Salam had a high performance evaluation rating is belied by evidence showing that the total average performance evaluation for him ranked in the bottom half of interviewees in 2006.  (*See* Summary Sheet (Ex. E to Def. Ex. 4.).)

Finally, the comment made by interviewer Tom Valentine during the March 2005 application process – which is not being challenged in this case – that Plaintiff Ocana had "some language problems" arguably reinforces the conclusion that Ms. Kenwood's comment did not betray discriminatory animus, and in any event does not warrant an inference of discrimination. (L.R. 56(a)2, Sec. 2, ¶ 8; Valentine's March 2005 Interview of Ocana (Pls. Ex. 48) at 442.); *see Beaver v. McHugh*, 840 F. Supp. 2d 161, 174 (D.D.C. 2012) ("The number of complaints from

various persons, who interacted with [plaintiff] across the full range of her responsibilities as a statistician, render entirely reasonable defendant's contention that language problems – not national-origin discrimination – led to her termination.").

When viewing the record as a whole, no reasonable juror could find that Ms. Kenwood's language-related remark was sufficient to show pretext.

### 2. Plaintiff Vidal

In his 2006 interview, Plaintiff Vidal received a rating of "some reservations about considering further" from two interviewers and "do not consider further" from one interviewer. (Pls. Ex. 19.)  Interviewer Miller supported his "do not consider further" rating of Plaintiff Vidal as follows: "Had no expectations of what he expected from FIT training even though he had obvious deficiencies.  Didn't do well on safety.  Didn't do well on situation questions.  Used some buzz words but didn't understand concepts."  (*Id*.)  Interviewer Stagnaro gave Plaintiff Vidal the mediocre rating of "some reservations about considering further" based on the following reasoning: "Good ans[wer] to situations.  Weak understanding of job responsibilities and safety.  Could not recall responsibilities of previous supervisory role (Q. 10)."  (*Id*.) Interviewer Kenwood similarly gave Plaintiff Vidal the rating of "some reservations about considering further" because he: "May do well w[ith] training. Sup[ervisor] quest[ion] ok; not great.  19 – ls/eq - concern; empl[oyee] states he has improved.  Nonchalant about int[erview]; showed no interest.  Unsure of FIT training expectations.  Not sure of foreman resp[onsibilities]; safety program."

As with Plaintiff Ocana, the reasons given by each interviewer for the rating selected were "clear and specific" and thus satisfied the standard set forth in *Byrnie* for transparency in a subjective hiring and promotion processes.  Further, the reasons provided by the interviewers do

not suggest animus and are supported by their notes regarding his performance during the interview.  For example, the interviewers' notes reflecting Plaintiff Vidal's answer to the second question are consistent with the comments that he did not have a clear expectation of what he expected to learn from the FIT program and showed little interest.  (*Id.* (Interviewer Stagnaro recorded Plaintiff Vidal's answer to the question "If you are accepted what do you expect to get out of this training program?" as: "I'm not sure . . . I am open and willing to learn whatever is nec[essary] . . . prompt → do job properly. Pulling teeth … getting nowhere.").)  Plaintiff Vidal's poor performance on safety-related questions is also reflected in the interview sheets.  (*Id.* (In the margin next to the question of what Plaintiff Vidal knows about a foreman's responsibilities and what skills he has, Interviewer Miller wrote "Safety?"  All of the interviewers recorded that when asked what the term "safety audit" means, Plaintiff Vidal responded "not sure."  Interviewers Stagnaro and Kenwood noted that when asked how often a safety audit should be done, Plaintiff Vidal responded "once/month, don't know.").)  Again, there is no suggestion in Plaintiff Vidal's interview sheets that any interviewer acted with discriminatory intent.

Plaintiff Vidal provides a comparison chart of Questions 1 and 13 in an effort to demonstrate that he responded to these questions in a manner similar to the Caucasian applicants. (*See* Local Rule 56(a)(2), ¶¶ 47-48.)  Question 1 asked: "Tell us what you know about a Foreman's responsibilities and what skills and abilities are necessary to be a good foreman?" Plaintiff Vidal responded that a foreman would need to be able to carry out the job properly and on time, have good communication skills, be a team player, a disciplinarian, and authoritative, and get along with superiors.  (*Id.* at ¶ 47.)  Mr. Grehl, the closest comparator to Plaintiff Vidal,[4]

---

[4] While Plaintiff Vidal received a rating of "110" from the interview panel, Mr. Grehl received a rating of "111."  As discussed below, Mr. Grehl's rating was later adjusted – upwards to "122" –

responded that a foreman must be a "leader" who is able to direct personnel, and who must know "FRA regulations," facility rules, and how to assign work.  (*Id*.)  While these responses may not be miles apart, they are clearly different and every interviewer apparently considered Mr. Grehl's response to be superior, noting his comments on leadership and knowledge of specific rules and regulations.[5]  This comparison provides no basis from which a reasonable juror could determine that Plaintiff Vidal was judged more harshly than Mr. Grehl based on some sort of discriminatory animus.

With respect to question 13, the question about safety audits, Plaintiff Vidal was unsure of the meaning of a safety audit and how often it should be performed.  (*Id*. at ¶ 48.)  Mr. Grehl, on the other hand, explained that a safety audit involved a foreman watching his employees' job performance and documenting their compliance; he added that such an audit should be done once a day.  (*Id*.)  Interviewer Kenwood noted in her recommendation that Mr. Grehl had a "good grasp of safety."  (*Id*. at ¶ 52.)  The interviewers' apparent conclusion that Mr. Grehl's response was superior was reasonably based on the evidence of the responses that appears in the record.

While the responses to Questions 1 and 13 by the other Caucasian candidates, all of whom scored better than Plaintiff Vidal in the interview, may have had some similarity to his responses, Plaintiffs have not provided comparison charts for other questions where these candidates outshined Plaintiff Vidal.  For example, while Plaintiff Vidal had to be prompted when asked what he expected to get out of the FIT program, Mr. Garnot replied that he hoped to

---

by the consensus committee after consideration of his performance evaluations.  (*See* Interview Sheets (Pls. Exs. 6 ).)

[5] In the comparison chart for Plaintiff Ocana's response to Question 1, no comparison was provided between Plaintiff Ocana and Mr. Grehl.  Mr. Grehl's response referring to leadership and rules and regulations was reasonably considered by the interviewers to be superior to Plaintiff Ocana's response that, as a foreman, he would be responsible for receiving orders and direction from management – especially given the instructions to look for a "'take charge' attitude."  (*See* Pls. Exs. 6, 15.)

acquire leadership skills and learn more about how the railroad worked.  (*See* Garnot Interview Sheets (Pls. Ex. 5).)  According to Interviewer Stagnaro, Plaintiff Vidal had difficulty recalling the duties of his previous supervisory experience (*see* Pls. Ex. 19); Mr. Garnot, on the other hand, had worked for seven years as lead maintenance of electrical/hydraulic equipment and, within the first year, brought MTF [mean time to failure] from 60% to 92% (*see* Pls. Ex. 5).

Finally, the comparison charts fail to consider other criteria that the interviewers may have considered in deciding to give Plaintiff Vidal a lower rating than the Caucasian applicants. For example, Interviewer Kenwood wrote that Plaintiff Vidal was "nonchalant about interview; showed no interest."  ((*See* L.R. 56(a)2, ¶ 52.)  Based on a review of Plaintiff Vidal's interview performance, there is no evidence indicating that the interviewers "disregard[ed] or misjudg[ed]" his subjective qualifications in a way that would call the credibility of the interviewer's ratings into question. *Byrnie*, 243 F.3d at 103.

### C.  Consensus Committee

Within two days after the interview, the two interview panels met as a committee to review the recommendations and reach a consensus about which applicants would be accepted to the FIT program.  (L.R. 56(a)1, ¶ 17; L.R. 56(a)2, ¶ 17.)  In 2006, the consensus committee consisted of six individuals – five Caucasian men and one Caucasian woman.  (Stagnaro Dep. (Def. Ex. 4) at 27; Vidal Aff. (Pls. Ex. 1) at ¶ 3.)  The committee assigned a numerical rating of 0 through 2 to correspond to the recommendation given by each interviewer; top performance in the interview resulted in a rating of "222" and lowest performance in the interview resulted in a rating of "000."  (*See* Stagnaro Aff. (Def. Ex. 7) at ¶¶ 27, 29.)  In addition to discussing interview performance, the consensus committee also reviewed each applicant's performance

evaluations.  (*See* Stagnaro Dep. (Def. Ex. 4) at 45-46, 52, 65.)  Based on this discussion, the numerical rating for a candidate could be changed.  (Stagnaro Aff. (Def. Ex. 7) at ¶ 30.)

Of the four Caucasian applicants, two had a rating of "222" such that it would not have been possible to increase their rating.  Mr. Garnot's numerical rating improved from "211" to "222" and Mr. Grehl's numerical rating improved from "111" to "122" as a result of discussions by the consensus committee.  (*See* Interview Sheets (Pls. Exs. 5, 6 ).)  There is no evidence in the record that any applicant's rating was lowered, rather than increased.  Plaintiffs' interview ratings were not adjusted as a result of the consensus committee discussion.

The consensus committee process was undoubtedly more opaque than the interview process, and there is not much contemporaneous evidence providing the basis for changing a given rating.  One of Mr. Garnot's interviewers wrote "change to accept" and the other wrote "willing to accept and give him a chance."  (Pls. Ex. 5.)  For Mr. Grehl, Interviewer Kenwood crossed out the box "some reservations about considering further" and checked the box "recommend applicant for promotion to foreman," and Interviewer Stagnaro wrote "after further discussion and taking scores into consideration recommend."  (Pls. Ex. 6.)

Interviewer Stagnaro explained in his affidavit that an applicant's ratings might be improved based on good performance evaluations, but that good performance evaluations "would not outweigh poor interview scores."  (Stagnaro Aff. (Def. Ex. 7) at ¶ 33.)  Because objective criteria had already been considered as part of the initial application process (i.e., before the interview stage), the committee did not usually review or discuss the applicants' attendance records, test scores, or disciplinary history.  (*Id*. at ¶¶ 35-36.)  "The race, national origin and ethnicity of the candidates being considered for the FIT Program were not mentioned or discussed in the consensus committee meeting."  (*Id*. at ¶ 41.)  Of import for the Plaintiffs,

both of whom received at least one "Do Not Consider Further" rating by the interview panel, the consensus committee "normally will not recommend a candidate for the FIT Program if at least one member of the interview panel says 'Do Not Consider Further.'"  (*Id.* at ¶ 40.)

There is no evidence in the record that contradicts the statements made in Interviewer Stagnaro's affidavit, and his deposition testimony supports the fact that the consensus committee reviewed the applicants' performance evaluations. (*See* Stagnaro Dep. (Def. Ex. 4) at 24-26, 52, 65.)  Because Plaintiff has not demonstrated any pretext arising out of the interviewer process or interview ratings, the issue of pretext arising out the consensus committee turns on the credibility and consideration of the applicants' performance evaluations.

In 2006, Defendant required as part of the FIT program application process that two performance evaluations be submitted for each applicant – one from an "agreement supervisor" and one from a "non-agreement" supervisor.  (L.R. 56(a)1, ¶ 65; L.R. 56(a)2, ¶ 65.)   An "agreement supervisor" is a first-line supervisor, such as a foreman, who is a member of a bargaining unit and covered by a collective bargaining agreement; a non-agreement supervisor refers to other supervisors and managers who are not members of a bargaining unit and are not covered by a collective bargaining agreement.  (*Id.* at ¶¶ 66-67.)  Evaluation forms were sent to department and shop managers, who distributed the forms to supervisors for completion.  (*Id.*, ¶ 68.)  Applicants were also told in advance that the selection criteria for the FIT program included "Performance appraisals from Agreement and Non-Agreement supervisors."   (Promotion to Foreman Flyer (Def. Ex. 5).)

While Defendant attempted to have a direct supervisor conduct each performance evaluation, this is not required and not always possible.  (*See* Bradley 30(b)(6) dep. (Def. Ex. 8) at 97, 99 ("Q. One of the things that you mentioned, I think, is the fact that while you try to get a

direct supervisor to do the evaluation, that because the employees work on shifts, it's not always possible to get the direct supervisor to do the evaluation? A. We try to get someone who has supervised the individual as much as possible.  Because the way it works in a shop is that, if you bid a job, sometimes you have a relief supervisor, sometimes you have a day supervisor.  So they're interchangeable – agreement supervisor. . . . Sometimes the supervisor's not available. Sometimes the supervisor went to another location.").)

The performance evaluation form asked the "rater" to rate the employee in thirteen different categories on a scale of one through five, with one being "unsatisfactory" and five being "superior."  (*See, e.g.,* Vidal performance evaluations (Pls. Ex. 28).)  A rater had the option of selecting "N.O." for any category, indicating that the performance was "not observed." (*Id.*) After the performance evaluation was submitted, the ratings for each category were summed and then divided by the total number of categories that were rated, which would result in an average rating; this would mean that if one category was rated as "N.O.," then the total sum would be divided by twelve, instead of thirteen.  (*See id.* (Kelly McGowan evaluation of Plaintiff Vidal).) The average rating across both performance evaluations was included as part of a "summary sheet" that was provided to and used by the consensus committee.  (*See* Stagnaro Dep. (Def. Ex. 4) at 29-30; Summary Sheet (Ex. E to Def. Ex. 4.).)

The summary sheet shows that Plaintiff Ocana's average performance evaluation rating was 2.8, the lowest of all nine applicants who were interviewed in 2006.  (Summary Sheet (Ex. E to Def. Ex. 4).)  Plaintiff Vidal's average rating was 3.5.  (*Id.*)  In comparison, Mr. Garnot had an average rating of 4.0, Mr. Bownas an average rating of 4.1, and Messrs. Murman and Grehl average ratings of 4.2.  (*Id.*)

Plaintiffs argue that the performance evaluations submitted as part of the application process lack credibility and did not follow Defendant's practices, and therefore demonstrate pretext.  (Pls. Opp. Mem. at 10-11.)   Because each Plaintiff had his own performance evaluations, I consider each Plaintiff separately.

### 1.  Plaintiff Ocana

Plaintiff Ocana's performance was evaluated by Kelly McGowan and Michael Gagliardi, Jr., neither of whom was his direct supervisor.  (L.R. 56(a)1, ¶ 71; L.R. 56(a)2, ¶ 71.)  Plaintiff Ocana takes issue with the fact that neither his direct supervisor, Alex Turner, nor the person listed on his application, Arthur Platt, filled out a performance evaluation.  (Pls. Opp. Mem. at 11.)  This fact, however, is insufficient to demonstrate pretext.  As Defendant's 30(b)(6) witness testified, a direct supervisor does not always fill out a performance evaluation.  (Bradley 30(b)(6) dep. (Def. Ex. 8) at 97, 99.)  Plaintiff Ocana has not pointed to evidence showing that he was singled out in a manner reflecting disparate treatment.

Although Plaintiff Ocana testified that he had little interaction with Mr. McGowan (*see* Ocana Dep. (Pls. Ex. 18) at 74), Mr. McGowan described himself as "reasonably familiar" with Plaintiff Ocana's work.  (McGowan 2006 Evaluation (Pls. Ex. 28), McGowan 2005 Evaluation (Pls. Ex. 49).)  While Plaintiff Ocana testified that he was told by coworkers to stay away from Mr. McGowan because Mr. McGowan did not like minorities (Ocana Dep. (Pls. Ex. 18) at 74-75), this is hearsay and thus cannot serve as a basis for defeating summary judgment.  *Lewis v. Town of Waterford*, 239 F.R.D. 57, 60 (D. Conn. 2006) ("A party cannot rely on inadmissible hearsay in opposing a motion for summary judgment . . . .  In accordance with this policy, a court may therefore strike portions of an affidavit that are not based on the affiant's personal knowledge, contain inadmissible hearsay or make generalized and conclusory statements.").

Plaintiff Ocana asserts that his performance evaluations are not credible because they reflected poor performance, and he had not previously been told that his performance was poor. (*Id.*)  But there is evidence in the record showing that Plaintiff Ocana was aware of some performance deficiencies. In 2005, Mr. Gagliardi, the non-agreement supervisor who was "reasonably familiar" with Plaintiff Ocana's work, rated Plaintiff Ocana as "adequate" in twelve categories and did not provide a rating for one of the categories.  (Gagliardi 2005 Evaluation (Pls. Ex. 49).)  In 2006, however, Mr. Gagliardi rated Plaintiff Ocana as "good" in one category, "adequate" in seven categories, and "poor" in five categories.  (Gagliardi 2006 Evaluation (Pls. Ex. 28).)  Mr. Gagliardi provided a reason for his lower evaluation in 2006: "I often observe this individual without his safety classes on.  I have spoken to him numerous times."  (*Id.*)  Further, even crediting Plaintiff Ocana's version of events – that he was not previously told of poor performance – that fact alone, and especially when viewed in the context of the entire record, is insufficient to permit a reasonable juror to infer discriminatory intent.

The consensus committee had the following subjective criteria available when considering Plaintiff Ocana: his "000" performance during the interview process and his performance evaluations, which reflected an overall performance that was lower than any of the other FIT program interviewees for the 2006 cycle.  In addition to Mr. Gagliardi's average rating of 2.7, Mr. McGowan had rated Plaintiff Ocana as "adequate" in nine categories, as "poor" in three categories, and did not provide a rating for the one of the categories, resulting in an average rating of 2.8.  (McGowan 2006 Evaluation (Pls. Ex. 28).)  As a result, Interviewer Stagnaro recalled that Plaintiff Ocana had "scored low" on his performance evaluations, which was discussed during the consensus committee.  (Stagnaro Dep. (Def. Ex. 4) at 52.)  Because Plaintiff Ocana did not have as strong a set of ratings on his interview or performance as any of the

Caucasian candidates who were accepted, and because he has failed to produce evidence from which a reasonable juror could infer that his ratings were not credible, he has failed to raise a genuine issue of material fact at the third stage of the McDonnell-Douglas framework with respect to the consensus committee process.

### 2.  Plaintiff Vidal

Plaintiff Vidal was evaluated by John Deponte and John Fucci.  John Deponte was Plaintiff Vidal's direct supervisor at the time and rated him favorably.   (L.R. 56(a)1, ¶¶ 73-74; L.R. 56(a)2, ¶¶ 73-74, Sec. 2, ¶ 10.)  Plaintiff Vidal takes issue with Mr. Fucci's review because Mr. Fucci rated Plaintiff Vidal lower in 2006 than in 2005.  (*Id*. at 10-11; *compare* Fucci 2006 Evaluation (Pls. Ex. 28), *with* Fucci 2005 Evaluation (Pls. Ex. 51).)  This provides no basis from which to infer discrimination, and, in fact, may warrant the reverse inference: the "same actor inference" applies "[w]hen the same actor hires a person already within the protected class, and then later fires that same person, [because] it is difficult to impute to [the actor] an invidious motivation that would be inconsistent with the decision to hire."  *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 137 (2d Cir. 2000).  Similarly, it does not make sense to impute discriminatory animus to Mr. Fucci, who was previously willing to give Plaintiff Vidal a better evaluation even though he was presumably aware of Plaintiff Vidal's race at that time.

The consensus committee had the following subjective criteria available when considering Plaintiff Vidal: his "110" performance during the interview process and his performance evaluations, which reflected an overall performance evaluation rating of 3.5.  While Mr. Deponte generally evaluated Plaintiff Vidal as "good," Mr. Fucci evaluated Plaintiff Vidal as having a mix of "poor," "adequate," and "good" performance across the various categories. (Deponte and Fucci 2006 Evaluations (Pls. Ex. 28).)  Of particular note is that Mr. Deponte

selected "not observed" for the "Leadership" category, and Mr. Fucci selected "poor" for that category.  There is no evidence in the record to support Plaintiff Vidal's contention that it was suspicious for Mr. Fucci to have rated Plaintiff Vidal in a category that Plaintiff Vidal's direct supervisor, Mr. Deponte, failed to rate.  (*See* Pls. Opp. Mem. at 12.)  Each evaluator was responsible for rating the employee based on his own observations, and there is no evidence to suggest that it would have been impossible for Mr. Fucci to have observed Plaintiff Vidal in a scenario in which he might (or might not) demonstrate leadership qualities.[6]  At his deposition, Interviewer Stagnaro noted that Plaintiff Vidal had one performance evaluation that was poorer than the other.  (*Id*. at 24-26.)

In comparison, Mr. Grehl – the closest Caucasian comparator[7] – had a "111" interview numerical rating and an average performance evaluation rating of 4.2, a score that tied him for the second best evaluation average among all applicants who were interviewed.  Joseph McLaughlin, who was "reasonably familiar" with Mr. Grehl's work, provided a rating of "good" in nine categories, "adequate" in two categories, and "not observed" in two categories.  (2006 Evaluation (Pls. Ex. 31).)  Daniel DeVoe, Mr. Grehl's direct supervisor, evaluated him as "superior" in eight categories and "good" in five categories.  (*Id*.)  In addition, Mr. DeVoe commented on the evaluation form that "Mr. Grehl is a pleasure to work with.  Rob is a team builder, and goes the extra mile to get things done."  (*Id*.)

As a result of Mr. Grehl's positive performance evaluations, two of the interviewers changed their interview rating to "2," so that Mr. Grehl's final numerical rating was "122."  *See*

---

[6]According to Interviewer Stagnaro, an evaluation that had a variety of ratings, like Mr. Fucci's, demonstrated more reflection and thoroughness than one with the same ratings for every category, like Mr. Deponte's.   (See Stagnaro Dep. (Pls. Ex. 4) at 26.)
[7] The other Caucasian individuals who were accepted into the FIT program are less apt comparators because their interview performances were significantly better than Plaintiff Vidal's.

Interview Sheets (Pls. Exs. 6).)   While Plaintiff takes issue with the fact that Mr. Grehl was accepted into the FIT program in 2006 after having performed poorly in the interviews six months earlier in 2005 (Pls. Opp. Mem. at 8), there is no evidence in the record showing that it was impossible for Mr. Grehl to have improved over the course of six months, or that it was inappropriate for the consensus committee to take his very strong performance evaluations into account.   Interviewer Stagnaro testified that "Mr. Grehl was chosen primarily because of his evaluations by his supervisors."  (Stagnaro Dep. (Pls. Ex. 4) at 65.)   Although Interviewer Stagnaro acknowledged that Mr. Grehl had a "weak interview," the consensus committee discussed and found favorable Mr. Grehl's "leadership potential."  (*Id*. at 67-68.)

As compared to Plaintiff Vidal, Mr. Grehl had superior performance evaluations from both his direct and non-direct supervisor.  Further, Mr. Grehl did not have any "do not consider further" interview ratings, while Plaintiff Vidal had one such rating; as noted, the unrebutted evidence showed that the consensus committee "normally will not recommend a candidate for the FIT Program if at least one member of the interview panel says "Do Not Consider Further." (L.R. 56(a)1, ¶ 85; Stagnaro Aff. (Def. Ex. 7) at ¶ 40.)[8]  In short, there is no evidence that the ratings resulting from the consensus committee process were the product of discrimination against Plaintiff Vidal.

---

[8] In its Local Rule statement, Defendant wrote: "The committee normally will not recommend a candidate for the FIT Program if at least one member of the interview panel says 'Do Not Consider Further.'  Vidal received one 'Do Not Consider Further' and Ocana received three (3) 'Do Not Consider Further' rankings." (L.R. 56(a)1, ¶ 85.)  Plaintiffs did not deny this consensus committee practice.  (L.R. 56(a)(2), ¶ 85) ("Admit that portion of the statement concerning the Plaintiffs' ratings.  The Plaintiffs neither admit nor deny the remainder.")  Under this Court's Local Rules, "[a]ll material facts set forth in said statement and supported by the evidence will be deemed admitted unless controverted by the statement required to be filed and served by the opposing party in accordance with Local Rule 56(a)2."  L. R. Civ. P. 56(a)1.  Since Plaintiffs failed to deny this statement or provide a "specific citation" to contrary evidence in the record, *see* L. R. Civ. P. 56(a)2, this consensus committee practice is deemed admitted by Plaintiffs.

### D. Numerical Disparity

Plaintiffs argue that evidence of pretext may be gleaned from statistics showing the rates of acceptance of minority and non-minority applicants to the FIT program.   (Pls. Opp. Mem. at 25-26.)  As a preliminary matter, Plaintiffs concede that these rates are essentially the same at the first stage of the process – the passage from the application stage to the interview stage.  They assert, however, that the rates of acceptance vary sharply after candidates reach the interview stage.  (Pls. Opp. Mem. at 26 ("A review of the Defendant's 2003-2006 Data illustrates the point that the percentage of white candidates who applied and interviewed from 2003 to 2006 was near the percentage of minority candidates who applied and interviewed during the same time.  Once they got to the interview stage, minority candidates were selected [at] a far lower rate than their white counterparts.").)[9]

The number of interviewees for the FIT program were as follows: 26 interviewees, 9 of whom were minorities (6 Black, 2 Hispanic), in 2003; 25 interviewees, 7 of whom were minorities (3 Black, 2 Hispanic, 2 Asian/Pacific Islander), in 2004; 12 interviewees, 5 of whom were minorities (3 Black, 1 Hispanic, 1 Asian/Pacific Islander), in 2005, session 1; 14 interviewees, 9 of whom were minorities (5 Black, 1 Hispanic, 3 Asian/Pacific Islander), in 2005, session 2; 9 interviewees, 5 of whom were minorities (2 Black, 2 Hispanic, 1 Asian/Pacific Islander), in 2006.  (M of E Promotion to Foreman Program Data (Pls. Ex. 36).)  On an aggregate level, there were a total of 86 interviewees: 51 Caucasian, 19 Black, 8 Hispanic, and 8 Asian/Pacific Islander.  (Id.)  25 Caucasian interviewees were accepted into the FIT program, at

---

[9] Plaintiffs' concession is reinforced by the conclusion of Defendant's expert statistician, Dr. Paul White.  Dr. White concluded that "[t]here is no statistically significant difference in the number of non-white candidates who were interviewed versus the number one would expect in a race-neutral process."  (Expert Report (Def. Ex. 33) at 8.)  Plaintiffs chose not to depose Dr. White.

an acceptance rate of 49%.  3 Black interviewees were accepted at an acceptance rate of 16%.  0 Hispanic interviewees were accepted.  1 Asian/Pacific Islander interviewee was accepted, at an acceptance rate of 13%.

While "Plaintiffs are correct that statistics are relevant to support a discrimination claim even in a disparate treatment case," Plaintiffs' use of these figures is flawed because "statistics [are] determinative at the *prima facie* stage of the analysis, rather than in the later inquiry into pretext."  *Vuona*, 919 F. Supp. 2d at 374.  "Statistical analysis is rarely sufficient to defeat summary judgment.  Although a generalized statistical analysis . . . can provide circumstantial evidence of an inference of discrimination in support of a *prima facie* case, as a matter of law, it is not sufficient to establish that the Defendant's legitimate business rationale . . . is false, or that [Plaintiffs' membership in a protected class] was the real reason for [the employment decision]." *Id*.; *see also Robinson v. Metro-N. Commuter R.R. Co.*, No. 94-cv-7374, 1998 WL 17742, at *9 (S.D.N.Y. Jan. 16, 1998) ("While statistical evidence may sometimes enable a plaintiff to carry its modest burden of creating a prima facie case, the Court is aware of no case where generalized statistical evidence has been held sufficient to refute, for summary judgment purposes, a defendant's particularized evidentiary showing of a nondiscriminatory explanation for a particular act complained of, in the absence of any other material, admissible evidence of discrimination." (internal citations omitted)).

Further, courts in this Circuit have held consistently that statistics are unreliable indicators of discrimination where, as here, they were calculated from a small set of data.  *See, e.g., EEOC v. Joint Apprenticeship Comm. of Joint Indus. Bd. of Elec. Indus.*, 186 F.3d 110, 119 (2d Cir. 1999) ("[S]uch a small sample would tend to produce inherently unreliable results."); *Waisome v. Port Auth. of New York & New Jersey*, 948 F.2d 1370, 1379 (2d Cir. 1991)

34

("[W]here statistics are based on a relatively small number of occurrences, the presence or absence of statistical significance is not a reliable indicator of disparate impact.  For smaller samples the value of the standard deviation rule drops off . . . . It is for this reason that, in cases involving small or marginal samples, other indicia raising an inference of discrimination must be examined."); *Lowe v. Commack Union Free Sch. Dist.*, 886 F.2d 1364, 1372 (2d Cir. 1989) (statistical comparison of the performance of thirty-four candidates who were part of the protected group versus three who were not was "not sufficiently substantial to support an inference of discrimination, particularly in light of the unreliability of such a small statistical sample"); *Teasdale v. City of New York*, 08-CV-1684, 2013 WL 5300699, at *9 (E.D.N.Y. Sept. 18, 2013) ("Plaintiff alleges that only one male over 40 failed the EVOC twice while seven women over 40, or 99% of women, failed the EVOC test twice.  Plaintiff alleges that this high failure rate for women over 40 shows that the EVOC has a disparate impact.  This argument is deeply flawed because plaintiff's sample size of seven women and one man is extremely small . . . ."); *Vuona*, 919 F. Supp. 2d at  374 ("The statistics offered by [Plaintiffs] are insufficient to prove pretext. . . . [T]he relevant universe is small: 28 employees were under consideration for the [reduction in force], and 14 were eventually laid off. This small sample size counsels against heavily weighting statistical evidence.").

Based on the case law, the number of Black and Hispanic interviewees for any given year is too small of a sample size to bear statistically significant data.[10]  Even taken collectively across all of the years, a comparison of the performance of 51 Caucasian interviewees versus 19 Black interviewees or 8 Hispanic interviewees is likely insufficient to yield statistically

---

[10] It is worth noting that in the September 2005 session, the only individuals who were accepted into the FIT program were minorities: 1 Black, 1 Asian/Pacific Islander.  (*See* M of E Promotion to Foreman Program Data (Pls. Ex. 36).)

significant results.  In any event, Plaintiffs have not provided any evidence that these figures are statistically significant, such as by offering opinions by a statistics expert to support their analysis.  *Compare Port Auth. Police Asian Jade Soc. of New York & New Jersey Inc. v. Port Auth. of New York & New Jersey*, 681 F. Supp. 2d 456, 466 (S.D.N.Y. 2010) (crediting fact that "Dr. Cavanaugh presented the results of his analyses to the jury and then explained why, in his opinion, they were significant given the sample size at issue"), *with In re W. Dist. Xerox Litig.*, 850 F. Supp. 1079, 1084 (W.D.N.Y. 1994) (noting that the plaintiffs "do not have an expert who is prepared to opine that defendants' statistics give rise to an inference of discrimination"), *and Carter v. Ball*, 33 F.3d 450, 456-57 (4th Cir. 1994) ("[I]f a plaintiff offers a statistical comparison without expert testimony as to methodology or relevance to plaintiff's claim, a judge may be justified in excluding the evidence." (internal quotation marks and citations omitted)).  Nor have Plaintiffs offered any alternative statistical evidence that might expand the sample size, such as "evidence concerning the impact which the selection procedure had when used in the same manner in similar circumstances elsewhere."  29 C.F.R. § 1607.4(D).

I conclude that, when considered in light of the record as a whole, Plaintiffs' statistical presentation is insufficient to carry their burden of demonstrating pretext.

### E.  Other Arguments

Plaintiffs make a number of other arguments in support their disparate treatment claims, all of which fail.  For example, they assert that "[n]o minorities sat as interview panelists/consensus committee members in 2006."  (Pls. Opp. Mem. at 20.)  This is debatable, due to the presence of Ms. Kenwood, a woman, on the panel that interviewed Plaintiffs.  Even if this assertion refers only to racial or ethnic minorities, however, it does not, by itself or in light

Case 3:12-cv-00248-MPS   Document 121   Filed 08/06/14   Page 37 of 39

of the record before the Court, furnish a basis for finding pretext or discrimination.[11]  *See, e.g.,*

*Turner v. Pub. Serv. Co. of Colorado*, 563 F.3d 1136, 1146 (10th Cir. 2009) ("Nor does the fact

that Turner's interview panel consisted of four men raise any concerns.  Turner proffered no

evidence that any of the interviewers held discriminatory attitudes or participated in past

discrimination."); *Obi v. Anne Arundel Cnty.*, 142 F. Supp. 2d 655, 670-71 (D. Md. 2001)

("[T]his missed opportunity by the County to craft a process that was more sensitive to

appearances does not translate into a showing that defendant's articulated reason for selecting

Tait is pretextual.  Nor would the fact that the interview panel was all white – by itself – permit a

reasonable juror to infer that race and/or national origin played an impermissible role in the

selection process.").

Plaintiffs also complain that "[t]he panelists' decisions were final and there was no

additional review by anyone at Metro-North," (Pls. Opp. Mem. at 20), and that John Hogan, a

Caucasian superintendent, initially denied Plaintiff Ocana's request for time off to attend the FIT

program interview, stating "I don't need more foreman, I need good electricians."  Neither of

these facts evidences pretext or discrimination; Hogan was not even a decision maker.  *See*

*Brown v. Cnty. of Erie*, No. 12-cv-251, 2013 WL 885993 (W.D.N.Y. Mar. 8, 2013) ("Courts

have routinely held that stray remarks by non-decision makers are insufficient, without other

evidence, to raise an inference of discrimination.").

Plaintiffs also point to previous class action litigation that was filed in 1994, resulting in a

class that included "all African American/Black employees who were actively employed by

Metro-North at any time during the period from January 1, 1985 to June 30, 2002."  (*Id.* at 2-3.)

---

[11] In the September 2005 session, Zanetta Johnson, a black woman, interviewed Plaintiff Ocana and gave him a "do not consider further" rating.  (*See* Pls. Ex. 21, Interr. Resp. 2 & 3; Pls. Ex. 22, Interr. Resp. 2 & 3; Ocana 2005 Interview Sheet (Pls. Ex. 45).)

Courts caution, however, that while "evidence of discrimination in employment decisions affecting other workers could support an inference that the decision makers harbored a bias against the protected class which might have affected other decisions, including the decisions adverse to the plaintiff, [t]his does not mean . . . that evidence as to the prior mistreatment of employees in a protected class necessarily gives rise to an inference that all subsequent employment decisions adversely affecting that protected class or someone in it, no matter how unrelated, are also tainted with bias.  Rather, some nexus between the circumstantial evidence of general bias and the [adverse employment decision] is required."  *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1117-18 (10th Cir. 2007).  Plaintiffs have not demonstrated any nexus between the previous class action lawsuit and the decisions not to accept them into the FIT program.  Plaintiff Vidal "received paperwork to join the class but declined because he had only been working at Metro-North for a short period of time."  (Pls. Opp. Mem. at 2.)  Further, there is a lack of nexus between conduct that was alleged to have occurred between 1994 and 2002, and the alleged disparate treatment in this suit that took place almost four years later, in 2006. *See Turner*, 563 F.3d at 1144 ("[W]e have clarified that a gap of two years between the alleged general bias and the adverse employment action signals a lack of 'temporal proximity.'"). Finally, the existence of a class action lawsuit is not, in and of itself, evidence of prior mistreatment of employees in a protected class; the class action lawsuit brought against Defendant settled and therefore does not constitute an actual finding of prior discrimination. (*See* Pls. Opp. Mem. at 3 ("A hearing was held before the court on November 26, 2002 and a Final Judgment and Order of Dismissal approving the Second Amended Stipulation of Settlement was issued on December 6, 2002.").)

**IV.     Conclusion**

For the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED.


IT IS SO ORDERED.


_____/s/_____
Michael P. Shea, U.S.D.J.


Dated:          Hartford, Connecticut
                August 6. 2014